# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

STEVEN CITY BROOMFIELD,

    Plaintiff

v.

ROMEO ARANAS, et. al.

    Defendants

Case No.: 3:17-cv-00683-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 40, 47

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 40, 40-1 to 40-6, 42.) Plaintiff filed a response. (ECF Nos. 59, 61, 67, 72.) Defendants filed a reply. (ECF No. 77.)

Also before the court is Plaintiff's Motion for Summary Judgment. (ECF Nos. 47, 47-1, 49, 50-1.) Defendants filed a response. (ECF Nos. 53, 55-1 to 55-8.) Plaintiff filed a reply. (ECF No. 78.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part; and, that Plaintiff's motion be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 11.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada

Correctional Center (NNCC). (*Id.*) Defendants are Dr. Romeo Aranas, Theresa Wickham, John Keast, Candis Lucas (now Rambur), and Dr. Martin Naughton.

On screening, Plaintiff was allowed to proceed with two Eighth Amendment claims for deliberate indifference to serious medical needs. (ECF No. 10.)

In Count I, Plaintiff alleges that he is a type-2 diabetic who suffers from neuropathy in his limbs, especially in his feet. As a result, he experiences painful swelling, discoloration, and pins and needles sensation in his feet. It makes walking difficult and painful. On February 27, 2017, he alleges that APRN Lorenzo Villegas (not a defendant) prescribed him diabetic footwear. From February 27, 2017, to August 17, 2017, he contacted defendants Lucas, Keast, Wickham, and Dr. Aranas, and informed them of his need for prescription footwear, but was denied the footwear for six months while he suffered in extreme pain. This claim is proceeding against Lucas, Keast, Wickham and Dr. Aranas.

In Count II, Plaintiff alleges that Dr. Naughton initially prescribed him Neurontin, a powerful drug that only partially assuaged his condition. He avers that Dr. Naughton then discontinued Neurontin and prescribed Nortriptyline, a far less efficacious painkiller that is cheaper than Neurontin. Dr. Naughton subsequently acknowledged that Nortriptyline was inefficient, but refused to substitute a more potent drug. This claim is proceeding against Dr. Naughton.

Defendants argue that there is no evidence of deliberate indifference because: (1) Plaintiff was ordered wide base shoes and received two pairs in 2017; (2) Plaintiff's Neurontin was cancelled because Plaintiff was "cheeking"[1] his medication, and then a substitute medication was

---

[1] NDOC Director of Nursing Services Patricia Smith states in her declaration that "cheeking" is the slang term for when a person who is supposed to be swallowing a medication instead saves it for some other purpose. (ECF No. 40-4.)

prescribed when the FDA determined that Neurontin was too dangerous to prescribe in the prison setting; (3) Dr. Aranas did not personally participate in the alleged violation as he only responded to a second level grievance; and (4) they are entitled to qualified immunity.

In his motion for summary judgment and opposition to Defendants' motion, Plaintiff argues that he was not given the wide base shoes that were ordered for his neuropathy related foot pain for 6 months, and he suffered in pain as a result. In addition, he argues there is no evidence that he was "cheeking" or misusing Neurontin, and that Dr. Naughton substituted Neurontin for a less efficacious drug.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

3

U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. Eighth Amendment Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and

1    substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131

2    (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was

3    wired shut for several months demonstrated a serious medical need).

4        If the medical need is "serious," the plaintiff must show that the defendant acted with

5    deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

6    omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

7    1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

8    even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

9    under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present

10   when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

11   official must both be aware of the facts from which the inference could be drawn that a

12   substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*,

13   511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

14       Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally

15   interfere[s] with medical treatment, or it may be shown by the way in which prison officials

16   provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal

17   quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely

18   denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*,

19   681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other*

20   *grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical

21   treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*,

22   974 F.2d at 1060.

23

1    "A difference of opinion between a physician and the prisoner—or between medical

2    professionals—concerning what medical care is appropriate does not amount to deliberate

3    indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

4    Instead, to establish deliberate indifference in the context of a difference of opinion between a

5    physician and the prisoner or between medical providers, the prisoner "'must show that the

6    course of treatment the doctors chose was medically unacceptable under the circumstances' and

7    that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

8    health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

9    **B. Footwear (Defendants Wickham, Keast, Lucas, and Aranas)**

10        **1. Summary of Argument and Evidence**

11        Defendants acknowledge that Plaintiff complained of foot pain and that APRN Lorenzo

12    Villegas ordered wide base shoes for diabetic neuropathy on February 27, 2017. Defendants

13    assert that this was not for prescription shoes, but instead for white Velcro shoes for wide feet

14    issued by NNCC's laundry division. According to Wickham, Plaintiff needed to take a copy of

15    the form to laundry, have his feet measured, and the wide base shoes would be issued. Wickham

16    states that she explained this process several times to Plaintiff when he questioned her about it on

17    the yard. In addition, she answered his grievance on August 4, 2017. (Wickham Decl., ECF No.

18    40-1.)

19        In his declaration, Keast states that there is a notation on the wide shoe order that it was

20    given to him, and he would contact laundry services at NNCC to see if they could provide the

21    shoes. Keast says that according to laundry staff, Plaintiff was issued the shoes—Calpria brand

22    shoes obtained from California Prison Industries Authority— on April 20, 2017, and on July 20,

23

2017.[2] According to Keast, these are the best shoe, and are similar to the Bob Barker brand sometimes ordered by the medical department. (Keast Decl., ECF No. 40-2.)

In his declaration, Dr. Aranas states that as medical director, he was responsible for reviewing and responding to grievances related to medical issues. On October 10, 2017, he responded to Plaintiff's grievance concerning the shoes that had been ordered. Dr. Aranas responded that the grievance was resolved because the shoes ordered had been issued. He did not personally evaluate or treat Plaintiff, or review inmate requests for treatment (presumably referring to kites). (ECF No. 40-5.)

Defendants maintain that Plaintiff received the shoes that were ordered in April and July of 2017; therefore, his medical needs were addressed. They also argue that they did not personally participate in the alleged constitutional violation. Keast only performed the ministerial duty of ensuring Plaintiff received the shoes he was ordered. Wickham, Lucas, and Dr. Aranas only responded to Plaintiff's grievance at different levels.

The medical records reflect that Plaintiff complained of neuropathy pain in his feet, and on February 27, 2017, APRN Villegas ordered him wide base shoes. (ECF No. 42-1 at 15.)

On March 14, 2017, Plaintiff sent an inmate request form (kite) to Wickham asking how long it would take to get his shoes. She responded asking him not to address kites to a particular person. (ECF No. 47-1 at 17.)

He sent another kite to Wickham on March 21, 2017, asking when he would receive his shoes and telling her that his feet were "killing" him. She responded that she had not received

---

[2] Plaintiff was also apparently issued these shoes on November 17, 2016; however, his claim relates to an allegation that he was not provided the shoes ordered by APRN Villegas on February 27, 2017; therefore, the fact that shoes were given to him on November 17, 2016 is immaterial.

1  written approval. (ECF No. 47-1 at 18.) He sent a kite on March 27, 2017, asking Wickham

2  again when he would get his shoes. She responded: "I have already answered this kite."

3  (ECF No. 47-1 at 15.)

4          On March 30, 2017, Plaintiff sent a kite to Keast asking when he would receive his shoes.

5  The response part of the form has a notation that says: size 9, 3 and 3 quarters. (ECF No. 47-1 at

6  5.)

7          He sent another kite to Keast on April 3, 2017, asking how long it would take to get his

8  shoes. There was no response. (ECF No. 47-1 at 6.) On April 16, 2017, he sent a kite to Keast

9  asking again about when he would be getting his shoes for his neuropathy, and stating that his

10  feet were hurting badly. The response states that the request for special shoes was submitted to

11  the utilization review panel and they had not yet received a response. (ECF No. 47-1 at 7.)

12          On April 26, 2017, he complained of foot pain. (ECF No. 42-1 at 14.) That same date, he

13  sent a letter to Dr. Aranas, stating that APRN Lorenzo Villegas had ordered him special shoes for

14  his diabetic neuropathy on February 27, 2017, and he had not received them yet, and needed

15  them to help with the pain in his feet. (ECF No. 47-1 at 27.)

16          On May 8, 2017, Plaintiff sent a kite to Keast stating that he asked Keast whether he was

17  still working on his diabetic shoes and Keast said no. Plaintiff stated this was not a joking matter.

18  Keast responded that he was serious, but he would check into it. Keast further stated that after he

19  put in the order for shoes, he was told that all special shoe requests need to go through the

20  utilization review panel (URP). He sent Plaintiff's to the panel but had not heard back and would

21  look into it. (ECF No. 47-1 at 9, 10.)

22          On June 18, 2017, Plaintiff sent another kite to Keast asking whether he had heard

23  anything from the committee, as his feet were hurting badly. (ECF No. 47-1 at 11.)

On July 20, 2017, Plaintiff asserts that he went to laundry services and his feet were measured, but his feet were not wide enough to receive wide base shoes. He was given size 9 Calpria shoes, but was not issued wide base shoes. He states that the shoes he received are those given to all inmates.

On July 27, 2017, Plaintiff sent a kite to Wickham asking to speak to her regarding the shoes. (ECF No. 47-1 at 14.) On July 30, 2017, Plaintiff sent a kite to Wickham asking to make an appointment with her about his shoes. (ECF No. 47-1 at 16.)

Plaintiff filed a grievance about his shoes. Wickham responded at the first level on August 4, 2017, stating that she reviewed the provider order for wide based shoes, and verified with the laundry department that Plaintiff's feet were measured and that he received wide base shoes on July 20, 2017; therefore, she denied the grievance as resolved. (ECF No. 47-1 at 13.)

Plaintiff states that on August 15, 2017, he received shoes with white Velcro straps from medical.

On September 25, 2017, Plaintiff sent a kite to the laundry officer asking whether he received wide shoes on July 20, 2017. The response states, that Plaintiff was issued a pair of Calpria shoes, but he was *not* issued wide shoes on July 20, 2017. (ECF No. 47 at 9.)

On September 26, 2017, Plaintiff sent a kite to Wickham, notifying her that her response to his first level grievance (on August 4, 2017), that Plaintiff received wide shoes from laundry on July 20, 2017, was false. (ECF No. 48 at 10, ECF No. 47-1 at 22.)

On October 18, 2017, he sent Dr. Aranas a letter regarding his grievance, advising Dr. Aranas that Wickham's response to the first level grievance was incorrect as he did not receive wide shoes on July 20, 2017. (ECF No. 47-1 at 26.) On October 19, 2017, he sent a kite

1  to Dr. Aranas, stating that he did not receive wide shoes from laundry on July 20, 2017, as

2  Wickham stated. (ECF No. 47-1 at 25.)

3      On October 23, 2017, Plaintiff sent a kite stating he never received wide shoes. (ECF No.

4  47-1 at 21.)

5      Plaintiff claims that his white shoes with Velcro straps were stolen and he had to

6  purchase another pair, which he received on May 29, 2018. On June 25, 2018, he requested black

7  wide toe box Velcro shoes as the white ones he had were too narrow. The provider's notes state

8  that black wide toe box shoes would be ordered if possible. (ECF No. 42-1 at 5.) Plaintiff asserts

9  that he was referred to an orthopedic specialist, Ortho Pro, who ordered orthotics and orthopedic

10  shoes, which he received on September 24, 2018. (ECF No. 59 at 5, 6, ECF No. 47 at 12.)[3]

11      **2. Lucas**

12      Defendants' motion for summary judgment does not describe the role Lucas played in the

13  alleged constitutional violation. (ECF No. 40 at 2.) In addition, declarations are submitted on

14  behalf of the other defendants in support of the motion for summary judgment, but not for Lucas.

15  The response to Plaintiff's motion for summary judgment does state that Lucas is a nurse, and

16  that she responded to Plaintiff's informal level grievance (ECF No. 53 at 2); however, the

17  grievance is not submitted so the court is unaware of what Plaintiff told Lucas or how she

18  responded.

19      In their opposition to Plaintiff's motion for summary judgment (and not in their own

20  motion), Lucas argues that she is entitled to summary judgment for lack of personal participation

21

22  [3] Much of Plaintiff's briefing focuses on the later order for referral to the specialist and provision of orthopedic shoes in 2018. The court agrees with Defendants that this is not relevant to

23  Plaintiff's claim in this action that he was denied the ordered footwear for six months, between the time it was ordered on February 27, 2017, and when he received wide base shoes in August of 2017.

1  because she only responded to a grievance. While Defendants argue that a person cannot be held

2  liable for responding to a grievance, that is not a correct statement of the law. Responding to a

3  grievance can subject a prison official to liability if the grievance put the responder on notice of a

4  risk to the inmate's health, and the grievance responder was in a position to act on that risk and

5  failed to do so. Again, the grievance is not submitted in order for the court to determine whether

6  Lucas knew of and disregarded a risk to Plaintiff's health or not.

7       The remaining argument that pertains to Lucas is Defendants' assertion that Plaintiff

8  received the shoes that were ordered. As will be discussed below, Plaintiff raises a genuine

9  dispute of material fact as to whether he received wide base shoes from laundry services.

10  With no further information about Lucas' involvement, the motion for summary judgment should

11  be denied as to Lucas for failing to meet the burden of establishing there is no genuine dispute as

12  to any material fact and she is entitled to judgment as a matter of law.

13       Plaintiff's motion for summary judgment also says nothing about Lucas' specific

14  involvement in this alleged constitutional violation, and  none of the evidence submitted in

15  support of his motion references Lucas. Therefore, Plaintiff's motion should also be denied as to

16  Lucas.

17      **3. Wickham**

18       Wickham is the Chief of Nursing Services for NDOC. She maintains that Plaintiff only

19  had to take a copy of the order form for the wide base shoes to laundry, have his feet measured,

20  and the wide base shoes would be issued, and that she explained this process to Plaintiff on the

21  yard several times when he asked about it. In addition, she answered his grievance stating that he

22  had been issued wide base shoes in July of 2017.

23

The evidence reflects that Villegas ordered the wide base shoes on February 27, 2017. Plaintiff sent kites to Wickham asking when he would receive the shoes, and complaining that he was in pain, on three occasions in March of 2017. While Wickham states that Plaintiff only had to go to laundry services and get measured to be issued the wide base shoes, Keast's responses to Plaintiff's kite indicate that this was not the process. Keast told Plaintiff that a request for special shoes had to go through the URP. In ant event, on July 20, 2017, Plaintiff did go to laundry services to be measured to obtain the wide base shoes. Wickham stated in her response to Plaintiff's grievance that Plaintiff received wide base shoes on July 20, 2017. Plaintiff disputes Wickham's statement that he was then issued wide base shoes. According to Plaintiff, he was measured, but his feet were not wide enough to receive wide base shoes, so he was given regular width shoes. Defendants argue that Plaintiff does not present any evidence to support this assertion, but he provides his own affidavit, as well as a response to a kite where a laundry officer states that Plaintiff was not issued wide base shoes on July 20, 2017. He advised Wickham of this in a kite.

This is sufficient to create a genuine dispute of material fact as to whether Plaintiff received wide base shoes on July 20, 2017, as Wickham asserts, or whether he was issued regular width shoes on that date, as Plaintiff maintains. If Plaintiff's version of events is believed, Wickham could be held liable for damages for the delay in Plaintiff getting the shoes between the end of February and when he states he received wide base shoes in August of 2017.

Defendants' motion for summary judgment and Plaintiff's motion for summary judgment should be denied as to Wickham due to the existence of a genuine dispute of material fact.

### 4. Keast

John Keast is the Director of Nursing Services at NNCC. Keast states that there is a
notation on the wide shoe order that it was given to him, and he would contact laundry services
at NNCC to see if they could provide the shoes. Keast says that according to laundry staff,
Plaintiff was issued the shoes—Calpria brand shoes obtained from California Prison Industries
Authority— on April 20, 2017, and on July 20, 2017. Keast argues that he only made sure that
Plaintiff's order for shoes would be filled by laundry, and this does not give rise to liability under
the Eighth Amendment.

First, Keast's description of the process by which Plaintiff would obtain the wide base
shoes is contradicted by his responses to Plaintiff's kites, which indicate that URP approval had
to be obtained before Plaintiff could receive the shoes ordered.

The shoes were ordered by APRN Villegas on February 27, 2017. Plaintiff sent a kite a
month later asking Keast when he would receive them. He sent another kite to Keast in the
beginning of April, and then again in mid-April, asking when he would receive his shoes, and
advising that his feet were hurting badly. It was at that point that Keast informed Plaintiff that the
request had been submitted to the URP, but there was no response yet. Plaintiff followed up with
Keast on May 8, 2017, and Keast said he still had not heard back from the URP, but would look
into it. Plaintiff sent another kite to Keast on June 18, 2017, again checking on the status of his
shoes, and advising that his feet heard badly.

While Keast states that Plaintiff received wide base shoes on April 20, 2017, there is no
evidence of this in the records, and there is a genuine dispute of material fact as to whether
Plaintiff received wide base shoes on July 20, 2017. As with Wickham, if Plaintiff's version of
events is believed, a jury could find Keast liable for the failure to provide Plaintiff with the wide

base shoes for the time period between when Plaintiff complained to Keast he had not received

the shoes and was in pain, until the time he claims he eventually received the wide base shoes in

August of 2017. Therefore, both Defendants' and Plaintiff's motions for summary judgment

should be denied with respect to Keast.

**5. Dr. Aranas**

Dr. Aranas was NDOC's medical director. Dr. Aranas argues, along with the other

Defendants, that Plaintiff received the shoes that were ordered for him. He also argues that he is

entitled to summary judgment because he did not personally participate in the alleged

constitutional violation as he did not personally evaluate or treat Plaintiff.

Again, there is a genuine dispute of material fact as to whether Plaintiff was given wide

base shoes on July 20, 2017.

In addition, Dr. Aranas argues that he only responded to Plaintiff's second level grievance

in his capacity as medical director, and contends he is not liable on this basis, citing *Peralta v.

Dillard*, 744 F.3d 1076, 1086-87 (9th Cir. 2014) (concluding that medical officer who signed

grievances but was not a dentist and did not independently review the need for dental care and

was not aware of the health risk).

Responding to a grievance can subject a prison official, including a medical director, to

liability under appropriate circumstances. *See Colwell v. Bannister,* 763 F.3d 1060, 1070 (9th

Cir. 2014) (NDOC medical director personally denied a grievance despite being aware

optometrist had recommended cataract surgery, and the Ninth Circuit concluded that a jury could

find that the medical director contributed to the decision to refuse treatment in conscious

disregard of an excessive risk to the inmate's health). *Peralta* is distinguishable from this case

1  because this is not a dental care claim. This is a medical care claim and Dr. Aranas is a medical

2  doctor.

3       Moreover, in addition to responding to the grievance, Plaintiff sent a letter to Dr. Aranas

4  on April 26, 2017, stating that Villegas had ordered shoes for his diabetic neuropathy on

5  February 27, 2017, and he still had not received them, and needed help with the pain in his feet.

6  There is no indication that Dr. Aranas did anything to respond to this letter. A fact finder that

7  believes that Plaintiff

8       He also sent a letter to Dr. Aranas on October 18, 2017 and a kite on October 19, 2017,

9  advising that Wickham's grievance response had been incorrect, and that he had not received

10  wide base shoes on July 20, 2017. While the October letters would likely not subject Plaintiff to

11  liability if he had already received the wide base shoes in August of 2017, the April 2017 letter

12  may give rise to liability.

13       For these reasons, both Defendants' and Plaintiff's motions for summary judgment should

14  be denied with respect to Dr. Aranas.

15  **6. Qualified Immunity**

16       Defendants argue that they are entitled to qualified immunity. The basis for their

17  qualified immunity argument is that there was no constitutional violation because Plaintiff he

18  was ordered wide based shoes, and he went to laundry services to pick up wide based shoes

19  twice, and so they took appropriate action.

20       Again, there is a genuine dispute of material fact as to whether Plaintiff received wide

21  base shoes on July 20, 2017; which negates the basis for Defendants' qualified immunity

22  argument.

23

**C. Medication**

The court will first address Plaintiff's claim that Dr. Naughton was deliberately indifferent to his serious medical need when he stopped Plaintiff's Neurontin.

According to Dr. Naughton, Plaintiff was started on Neurontin at 150 mg by Dr. Mar on July 18, 2016. On July 24, 2016, he complained that he did not like the way it made him feel. He was changed to 200 mg on July 25, 2016, by Dr. Marks. Dr. Naughton states that on July 26, 2016, it was reported to nursing staff by another inmate that Plaintiff had been "cheeking" his Neurontin and Clonidine and giving it to female inmates via the book cart. Three tabs were found in his room. Dr. Naughton indicates that on July 27, 2016, Plaintiff admitted to a nurse that he had been "cheeking" medications. Another inmate also reported that he had been hiding his "cheeked" medications in his sock while the cell search was being conducted, and he put medications down the drain while being held in the shower room. Dr. Naughton states that on July 27, 2016, Neurontin and Clonidine were stopped because of the reported "cheeking" and not due to its cost. (Naughton Decl., ECF No. 40-3.)

Preliminarily, Plaintiff presents no evidence to dispute Dr. Naughton's statement that Neurontin was not discontinued due to its cost.

Next, Plaintiff takes issue with Dr. Naughton's statements about the "cheeking" of medication, claiming that he was never found to be "cheeking" Neurontin, only Clonidine. Therefore, he claims that the Neurontin should not have been stopped.

Plaintiff admits that he was found to be "cheeking" or improperly saving Clonidine, and he was charged as such.

NDOC Director of Nursing Patricia Smith states in her declaration that the practice of "cheeking" can be a problem for prison management as well as for the inmate who is not taking

his medication. If an inmate intends to sell the medication and uses it to barter among inmates, this is a problem for prison administration. In addition, an inmate can "cheek" a medication because he is intimidated to give up a medication to other inmates, and then is deprived of needed medications. In additions, medications, even over the counter medications, can be "cheeked" and saved up for a suicide attempt. (ECF No. 40-4.)

There is a dispute of fact as to which medication Plaintiff was caught and charged with "cheeking;" however, the court finds this disputed fact is not material because, even if Plaintiff was only caught "cheeking" Clonidine, it was not medically unacceptable under the circumstances to stop his medications due to misuse. *See Howard v. Paulson,* No. 2:17-cv-01629-MK, 2020 WL 2026328, at *2 (D. Or. Apr. 2, 2020), *report and recommendation adopted*, 2020 WL 2025364 (D. Or. Apr. 27, 2020) (not deliberate indifference where prescription for Neurontin was not renewed where doctor said it was a medication that was regularly "cheeked" and diverted by inmates, and the inmate had several instances of diverting or misusing medications); *Thunderbird v. Oregon Dept. of Corr.*, No. 3:08-CV_01494-PK, 20l2 WL 2522673, at *5 (D. Or. May. 22. 2012) (finding no deliberate indifference where there was a difference of opinion between inmate and medical provider where medical provider reduced dose and converted it to crushed form after inmate was observed attempting to hide medication), *report and recommendation adopted* at 2012 WL 2522587 (D. Or. June 28, 2012), *affirmed* at 570 Fed.Appx. 693 (9th Cir. 2014) (unpublished) (properly granted summary judgment because no genuine dispute of material fact that the doctor disregarded a serious risk of harm in adjusting his medications), *cert. denied.,* 135 S.Ct. 687 (2014).

The court will now address Plaintiff's argument that Dr. Naughton was deliberately indifferent when Plaintiff was prescribed Nortriptyline instead of Neurontin because it was not effective.

Dr. Naughton states that he stopped Plaintiff's Neurontin because he had been "cheeking" medications. Then, on October 24, 2016, Dr. Mar prescribed Nortriptyline at 25 mg. The dosage was increased to 50mg on February 27, 2027. Dr. Naughton saw Plaintiff on March 27, 2017, and Plaintiff did not complaint of pain. On April 24, 2017, Plaintiff saw Dr. Naughton and he complained of foot pain. According to Dr. Naughton, Plaintiff did not show up to appointments on May 5, June 2, June 5, and June 7, 2017. He was seen for a follow up for his thyroid, difficulty swallowing, and requested cough drops on June 14, 2017. On July 26, 2017, he was non-compliant with his medications. On August 14, 2017, he had no complaints. He did not show up for his appointment on August 23, 2017. Dr. Naughton saw him again on June 25, 2018, and he complained of foot pain. He was given Tegretol for his foot pain. Dr. Naughton states that Neurontin is no longer available to inmates except for its FDA approved uses of seizure disorder and herpes zoster. (Naughton Decl., ECF No. 40-3.)

Plaintiff's issue with being prescribed Nortriptyline in place of Neurontin is a difference of opinion with his medical providers regarding which medication he was prescribed. To give rise to liability under the Eighth Amendment, it must be demonstrated that the treatment his doctors chose "was medically unacceptable under the circumstances and that they chose their course in conscious disregard of an excessive risk to his health."

Plaintiff complained about the initial dosage of Nortriptyline, and ARPN Villegas increased the dosage. His subsequent progress notes do not appear to contain any further

complaint about Nortriptyline to Dr. Naughton, or otherwise. Plaintiff claims that this was a less efficacious medication, but the evidence does not support his claim.

Since Plaintiff asserts a difference of opinion regarding the change from Neurontin to Nortriptyline, he must demonstrate that prescribing Nortriptyline in place of Neurontin (or some other available drug) was medically unacceptable under the circumstances, and Plaintiff has failed to do so.

In sum, Defendants' motion for summary judgment should be granted with respect to the Eighth Amendment claim against Dr. Naughton, and Plaintiff's motion for summary judgment should be denied as to Dr. Naughton.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 40) only as to Dr. Naughton, and otherwise **DENYING** Defendants' motion for summary judgment.

The District Judge should also enter an order **DENYING** Plaintiff's motion for summary judgment (ECF No. 47).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 19, 2020

                                William G. Cobb
                                United States Magistrate Judge